HAMBURGERS YORK ROAD, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE ISAAC HAMBURGER & SONS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 92387, 92388. Filed March 17, 1964.

*George Gump* and *Shale D. Stiller*, for the petitioners.
*Donald W. Howser*, for the respondent.

826

828

832

OPINION

*Issue 1*

In considering the first issue in the instant case, we find that the respondent has determined that the taxable income of York Road should be included in the taxable income of its sister corporation, Hamburger & Sons, for each of the 3 taxable years here involved. As statutory warrant for his action, respondent relies upon section 61(a) and section 482 of the 1954 Code. We must decide whether on the basis of the facts and circumstances of this particular case, his determination is correct.

We first consider the case in the light of the impact of section 482, the regulations thereunder, and the judicial authorities construing said section and the cognate provisions of the prior revenue acts (principally section 45 of the 1939 Code). Section 482 [1] provides, insofar as is here pertinent, that in the case of two or more organizations or businesses owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among them, if he determines that such actions are necessary in order clearly to reflect the income of any of such organizations or businesses, or to prevent an evasion of taxes.

Decided cases make it clear that the Commissioner has broad discretion in applying section 482; and that the determinations which he makes pursuant thereto will be sustained unless the taxpayer establishes that the Commissioner has abused his discretion. A court's review of such determinations is not *de novo;* and the determinations will be overturned only where the taxpayer proves that they are arbitrary, capricious, or unreasonable. See *Grenada Industries, Inc.*, 17 T.C. 231, 255 (and the cases cited therein), affd. 202 F. 2d 873 (C.A. 5).

The purpose of said statute is to prevent the evasion of taxes by the *shifting of profits*, the making of fictitious sales, and other methods customarily used to "milk" a taxable entity. H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17, reprinted in 1939–1 C.B. (Part 2) 395; S. Rept. No. 960, 70th Cong., 1st Sess., p. 24, reprinted in 1939–1 C.B. (Part 2) 426. *Ballentine Motor Co.*, 39 T.C. 348, 357, affd. 321 F. 2d 796 (C.A. 4).

---

[1] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The regulations under section 482 (Income Tax Regs., sec. 1.482–1(c)) provide in here pertinent part:

(c) *Application.* Transactions between one controlled taxpayer and another will be subjected to *special scrutiny* to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. *The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [Emphasis supplied.]

The regulations also define the term "true taxable income," appearing in the foregoing, as follows:

(a) *Definitions.* When used in this section—

\*       \*       \*       \*       \*       \*       \*

(6) The term "true taxable income" means, in the case of a controlled taxpayer, the taxable income (or, as the case may be, any item or element affecting taxable income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deductions, the credits, the allowances, or the item or element of income, deductions, credits, or allowances, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, chose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto). [Income Tax Regs., sec. 1.482–1(a)(6).]

It will be observed that section 482 speaks of distributing, apportioning, or allocating "gross income, deductions, credits, or allowances" between or among controlled taxpayers. In some of the earlier cases, this Court and others held that the foregoing statutory language conferred no power on the Commissioner to distribute, allocate, or apportion *net* income. See *Chelsea Products, Inc.,* 16 T.C. 840, affd. 197 F. 2d 620 (C.A. 3); *T.V.D. Co.,* 27 T.C. 879. However, in the more recent case of *Ballentine Motor Co., supra,* which was affirmed by the Court of Appeals for the Fourth Circuit, we took a contrary position, and there stated in part:

We believe that net income may in certain instances be properly allocated under section 45 and currently section 482. If net profits are shifted (one device at which the statute was specifically directed), it would be a logical short cut to allocate them instead of allocating "gross income, deductions, credits, [etc.]." The other devices of income shifting mentioned by the committee reports similarly suggest allocation of such income. The statute allows allocation of gross income and deductions, and to the extent this is permitted we believe it may be done as "net income."

Bearing the foregoing criteria in mind, we turn to the facts of the instant case. It is at once apparent that there is here present the requisite common ownership and control over the two corporate business organizations involved. The same individuals served in the same officer capacities in both corporations. The directors were the same persons in both corporations, with the exception of Sidney Berney who was a director of Hamburger & Sons but not of York Road. And both corporations had the same stockholders.

Common control, however, is not the end of the matter; for, as we stated in *Ballentine Motor Co., supra*, "taxpayers owned or controlled by the same interests may enter into transactions *inter se* and if fair, or resulting from arm's length bargaining, such transactions will be undisturbed." 39 T.C. at 357. Accordingly, if the respondent is to prevail on this issue in the instant case, it must still be found that Hamburger & Sons in the conduct of its affairs vis-a-vis York Road and in the transactions which it had with the latter corporation, did not deal with York Road at arm's length, as one uncontrolled corporation would have dealt with another uncontrolled corporation. In the light of the respondent's determination that all taxable income (actually, the equivalent of net profit) of York Road is to be included in the income of Hamburger & Sons, our more specific question becomes this: Have the petitioners established that the respondent was arbitrary, capricious, or unreasonable in his determination that if Hamburger & Sons and York Road had been dealing at arm's length as uncontrolled organizations, Hamburger & Sons would have required that all profits of York Road be turned over to it?

The evidence establishes that the operation of the two stores here involved was substantially the function of Hamburger & Sons. Betty Hamburger, who had many years' experience as public relations director and advertising manager for the downtown store, placed all advertisements for both stores, and continued to employ the same tried and tested format that Hamburger & Sons had used prior to the organization of York Road. The selection of merchandise for both stores, the supervision over the display thereof at both stores, and also the supervision over the sales forces of both stores, were all handled by the department manager located at the downtown store, except in the case of one department at the suburban store which had its own manager. And even as to this exception, we believe it reasonable to infer that the overall merchandising supervision given by Isaac Hamburger and Albert Berney to all departments at both stores assured that Hamburger & Sons' long-established experience would be applied also to that one exceptional department.

In addition, the compensation paid to the department managers of both stores was computed on a sliding scale, based on the combined sales of both stores. Employees of Hamburger & Sons made the al-

terations on clothing sold at York Road. The downtown store furnished the telephone switchboard service for both stores. Moreover, Hamburger & Sons acted as the paymaster and disbursing agent for both stores; its employees kept the books for both stores; and all daily cash receipts of York Road were turned over to Hamburger & Sons for deposit in the latter's bank account for all 3 years here involved, except the first 9 months of the new store's operation. Hamburger & Sons also took over all the customers' accounts receivable which arose at the York Road store; and it billed and collected the same along with its own accounts receivable. Thus, the conclusion is a compelling one, that the two stores (which in form were operated by two separate corporations) were in substance and in fact, actually parts of a single, integrated retail men's clothing business—with the downtown store of Hamburger & Sons serving as the headquarters, and with the suburban York Road store serving merely as a branch or division.

Our inquiry will now focus on what Hamburger & Sons contributed to this integrated business enterprise, and what (if anything) York Road contributed. For more than 100 years, the founders of Hamburger & Sons, and their successors, had, through their labors, established one of the most outstanding men's wear businesses in the Baltimore area. The success of the business which they thus developed was due principally, not merely to the racks and display cases filled with merchandise, but rather to the reputation established for dependable and courteous service to the public and to the skills employed by its organization in selecting merchandise with an eye to high quality, right quantity, and salable style. And all these could only be assured through use of a knowledgeable purchasing and merchandising organization and through application of long years of experience. The name "Hamburgers" had, over the many years prior to 1955, become a hallmark for business integrity, and it was the focal point for a goodwill of great value which was primarily responsible for producing both sales volume and business success. Likewise, the customer lists and the sales organization of Hamburger & Sons were additional assets and attributes of very substantial value in the retail clothing business.

All of the foregoing assets and attributes were contributed to the integrated and unitary enterprise which was operated after the establishment of the new suburban store in 1955; and the record herein clearly establishes that the York Road segment of the enterprise made full use of the same. The two stores were at all times represented to the public as "Hamburgers." The promotional advertising for both stores was continuously presented in one format, using the "Hamburgers" name; and after the York Road store was opened, the trade name "Hamburgers" was displayed on the front in a sign of similar design to that displayed on the downtown store, and a shield-shaped

emblem was placed on the front door on which appeared the legend "Since 1850." Also, existing customers of the downtown store were informed that their charge accounts at the downtown store could thereafter be used for purchases made either at the downtown store or at the York Road suburban store.

Notwithstanding the foregoing facts and circumstances, petitioners here contend that the net profits of York Road should be fixed by charging against the sales of that store only the net current operating cost of such store, without any consideration being given to the above-mentioned factors of goodwill, trade name, experienced buying and selling organizations, customer lists, and advertising format which Hamburger & Sons furnished for the use of York Road. We are confident that Hamburger & Sons would not have permitted such an arrangement, if it had dealt with York Road at arm's length. For such use of its business organization and assets, Hamburger & Sons would, we believe, have claimed for itself the profits in their entirety of the York Road segment of the integrated business.

To be sure, York Road contributed to the integrated enterprise an attractive business location, and a modest amount of capital. But, when we examine these more closely, in their context in this case, their power to command any portion of the profits of the York Road segment of the integrated enterprise is quickly perceived to be more apparent than real. As regards the location, the findings of fact establish that the lease on the premises was acquirable by York Road only on the strength of its affiliation with Hamburger & Sons and on the strength of that corporation's guaranteeing York Road's performance of its lease obligations. In short, Hamburger & Sons could have acquired the lease itself, and we believe that, in arm's-length dealing with a stranger (rather than with its sister corporation), it would have refused to yield any profits of the York Road segment as a consequence of York Road having the lease on the attractive business location.

As regards the capital of the York Road corporation, we find that it totaled only $85,000, consisting of $20,000 paid in for stock and $65,000 borrowed from two sources: (1) $25,000 from Sidney Berney and his wife on York Road's unsecured promissory note and (2) $40,000 from a bank on York Road's note which was guaranteed by its directors. Here again, we are led to conclude that Hamburger & Sons could have used its own capital funds to open the new suburban store; it was not compelled to seek outside financing for that purpose. In fact $45,000 came from Hamburger & Sons stockholders; and they would surely just as readily put such funds (assuming the need for the same) directly into Hamburger & Sons, rather than into a separate corporation. No doubt the bank's loan of $40,000 to York Road took into consideration that Hamburger & Sons' business organization, assets, and attributes were being made available to the new store. Hence the loans

(that of the bank and that of the Berneys), realistically considered, were worth only the interest charges required to obtain them; and York Road's deductions for such interest have not been disturbed by the respondent. Those loans, and the paid-in capital, would not in our judgment have merited a share of the profits of the York Road segment of the integrated enterprise.

It must also be observed that there was no pressing business need requiring a separate corporation to operate the York Road suburban store. We have hereinabove found as an ultimate fact, after considering and weighing all the relevant evidence, that there would not have been any substantial difference in Hamburger & Sons operations, and no substantially different records would have been required, if it had operated the suburban store as a division of the Hamburger & Sons corporation. Thus, we are convinced, and we have likewise found as an ultimate fact, that the principal purpose for the separate corporation was to avoid Federal income tax by securing the benefit of an additional surtax exemption—which would be applied against that portion of the profits of the integrated, unitary enterprise that would be shifted over to York Road. True enough, under York Road's lease, the rental payable was in part pegged to the gross sales at the York Road store; and York Road was required to maintain such accounting records as would enable the lessor to verify the sales at that store. But separate incorporation was not required in order to permit compliance with these lease terms. Ascertainment of the sales of a divisional branch (or even a branch's net operating profit) is a familiar technique of conventional accounting for such branches. See Finney & Miller, Principles of Accounting—Advanced, ch. 16 (5th ed. 1960).

Petitioner has argued in defense of the separate incorporation of York Road, that this was necessary in order to accommodate the desire of Albert and Henry Berney for a larger interest in the York Road store than they had in the downtown store. But this argument is not realistic. The evidence establishes, in the light of the close family relationship prevailing in the ownership and operation of Hamburger & Sons, the retired status of Sidney Berney, and the historical pattern of keeping the ownership in the family and permitting such ownership to follow those who were actively participating in the Hamburger & Sons enterprise, that the Berney brothers' desire could have been met by appropriate adjustments in Sidney's stockholdings in Hamburger & Sons, without having to form a new corporation.

The petitioners have argued also that what was done here by the respondent amounted to effecting a consolidated return for Hamburger & Sons and York Road, in alleged contravention of the re-

spondent's regulations, section 1.482–1(b)(3), which read in part as follows:

Sec. 1.482–1 Determination of the taxable income of a controlled taxpayer. * * *

\*   \*   \*   \*   \*   \*   \*

(3) Section 482 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the district director to apply such provisions. It is not intended (except in the case of the computation of consolidated taxable income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income, deductions, credits, or allowances, or any item of gross income, deductions, credits, or allowances, as would produce a result equivalent to a computation of consolidated taxable income under subchapter A, chapter 6 of the Code.

But the same contention was adequately answered in *Advance Machinery Exchange* v. *Commissioner* 196 F. 2d 1006, (C.A. 2), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 835. There, the Commissioner had (as he has done here) allocated all of the net income of two other corporations and a proprietorship to the corporate taxpayer. The Second Circuit rejected the taxpayer's consolidated return argument, as follows:

At first blush, this regulation would seem to support the petitioner's position but analysis shows the contrary. The effect of such an interpretation would be to exclude from the applicability of § 45 fact situations like the present one if the separate entities involved were all corporations and the Commissioner had sought to allocate all of the income from each to one of them, since this "would produce a result equivalent to a computation of consolidated net income under § 141." * * * Whatever valid interpretation may be given this regulation, the unsoundness of that of the petitioner is illustrated by the fact that it would exclude from the "policing" provisions of § 45 the most flagrant evasion by arbitrary shifting of income. It would let the Commissioner reallocate the income of these separate entities, to reflect the income of each correctly, if the amount involved, however great, did not equal their total combined income but he could not apply § 45 at all if the taxpayers succeeded in constructing a situation where, in order to prevent tax evasion or properly to reflect income, it were necessary to attribute all of the income of the separate entities to one of them, as was done here. Thus tax evasion could be so complete as to make itself invulnerable, a proposition whose statement discloses its fallacy.

Also, it must be observed that in the present case, a consolidated return could not have been filed for the two petitioners lacked a common corporate parent and were merely owned and controlled by the same individuals. See sec. 1504(a), 1954 Code.

In the light of all the foregoing, we are impelled to conclude that petitioners have not established that the respondent acted arbitrarily, capriciously, or unreasonably in his determination under section 482 that York Road's taxable income was includable in the taxable income of Hamburger & Sons. Indeed, the evidence in this case affirmatively establishes the reasonableness of the respondent's action; and we have made an ultimate finding of fact that he did not act arbitrarily, capri-

ciously, or unreasonably. We accordingly approve the determination made under the authority of section 482.

Having thus sustained the Commissioner's determination under section 482, it is not necessary for us to consider or determine whether section 61(a) furnishes additional warrant for such determination.

*Issue 2*

As regards the second issue, we have pointed out in our preliminary statement hereinabove, that the respondent conceded there would be no deficiency due from the York Road petitioner if the Court were to determine (as it now has) that York Road's taxable income is chargeable to Hamburger & Sons. Wherefore, it is not necessary for us to decide the second issue of whether York Road should be denied the exemption from surtax provided by section 11(c), under the authority either of section 269(a) or of section 1551.

To permit recomputations reflecting the stipulations of the parties,

*Decisions will be entered under Rule 50.*