THE KAHLER CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2288–70.    Filed June 20, 1972.

---

Robert J. Johnson, John W. Windhorst, Jr., and Michael Trucano, for the petitioner.

Robert F. Cunningham, for the respondent.

IRWIN, Judge: Respondent determined a deficiency in petitioner's income taxes for the years 1965 and 1966 in the amounts of $85,434.31 and $90,105.22, respectively. Because of concessions stipulated by both parties prior to trial, only one issue with respect to the application of section 482 remains for decision. A computation under Rule 50 will be necessary to reflect the pretrial concessions and the ultimate resolution of the remaining issue in the case.

## FINDINGS OF FACT

Some of the facts have been stipulated. These stipulated facts and the exhibits attached thereto are incorporated herein by this reference.

The Kahler Corp. (hereafter Kahler or petitioner) is a Minnesota corporation engaged in the business of owning and operating hotel and motel properties. During the tax years in question, petitioner kept its books and reported its income pursuant to the accrual method of accounting, filed its annual corporation tax returns with the district director in St. Paul, and maintained its principal office in Rochester, Minn.

Prior to 1960, Kahler was engaged in the hotel business in Rochester through its operation and ownership of the Kahler and Zumbro Hotels, the former being the largest hotel in the State of Minnesota. Petitioner also engaged in the laundry and drycleaning business through its wholly owned subsidiary, Lawler's, Inc.

The Kahler management in the early 1960's decided to expand its operations beyond the limits of the city of Rochester. In each city into which Kahler wished to expand, a wholly owned subsidiary would be established to operate and manage the new hotel and motel properties in that particular city and its environs. During the Kahler period of expansion, 1960 through 1966, Kahler subsidiaries were formed in Owatonna, Mankato, Minneapolis, Albert Lea, Hibbing, and Moorhead, Minn., and Fargo, N.D.

The wholly owned subsidiaries maintained their principal offices at the same location occupied by petitioner in Rochester. While petitioner's books were kept on a calendar year basis, the subsidiaries' books were kept on a fiscal year basis. The following schedule shows the date of incorporation, capitalization, and nature of the business conducted by each of petitioner's subsidiaries, including the laundry subsidiary of petitioner which was in operation prior to 1960:

498

| Subsidiary | State of incorporation | Date of incorporation | Shares authorized | Shares issued | Par value per share | Par value stock issued | Capital contribution | Total amount invested as of December 31, 1966 | Price paid for stock [1] | Nature of business |
|---|---|---|---|---|---|---|---|---|---|---|
| KFM Hotel Co. | Minnesota | 8/23/61 | 1,000 | 100 | | $100,000 | | [2] $100,000 | | Owns and operates hotel in Morehead, Minn. |
| Lawler's, Inc. | Minnesota | 4/26/54 | 1,500C / 250P | 78 / 250 | $100 / 100 | 7,800 / 25,000 | | | $223,114.25 | Owns and operates laundry and dry-cleaning establishment in Rochester, Minn. |
| Mankato Inn Towne Motel, Inc. | Minnesota | 4/20/61 | 5,000 | 500 | 100 | 50,000 | [3] $200,000 | 250,000 | | Owns and operates motel in Mankato, Minn. |
| Oak Manor Motel, Inc. | North Dakota | 6/11/65 | 500 | 500 | 100 | 50,000 | [4] 150,000 | [5] 200,000 | | Owns and operates motel in Fargo, N.D. |
| Owatonna Inn Towne Motel, Inc. | Minnesota | 11/10/60 | 2,000 | 1,600 | 100 | 160,000 | [6] 40,000 | 200,000 | | Owns and operates motel in Owatonna, Minn. |
| Albert Lea Inn Towne Motel, Inc. | Minnesota | 11/1/65 | 1,000 | 1,000 | 100 | 100,000 | [6] 80,000 | 180,000 | | Owns and operates motel in Albert Lea, Minn. |
| Hibbing Inn Towne Motel, Inc. | Minnesota | 4/14/66 | 1,000 | 1,000 | 100 | 100,000 | [6] 91,500 | 191,500 | | Owns and operates motel in Hibbing, Minn. |
| Minneapolis Inn Towne Motel, Inc. | Minnesota | | | | | 10,000 | [7] 690,000 | [8] 700,000 | | Owns and operates motel in Minneapolis, Minn. |

[1] Amount Kahler paid for existing stock.

[2] In September 1961, KFM Hotel Co. acquired the Frederick Martin Hotel from an unrelated party at a purchase price of approximately $810,000. Of the total price, approximately $437,000 was paid by assuming the outstanding mortgage indebtedness to which the real estate was then subject. The balance, approximately $373,000, was paid in cash on or before the closing. The cash balance was paid by KFM Hotel Co. from the original capital contributed by petitioner ($100,000) and an advance by petitioner in September 1961 in the amount of approximately $275,000. The mortgage subject to which the property was acquired provided for the payment of principal and interest by constant-level monthly payments in the amount of $3,715. These monthly payments were made by KFM Hotel Co. in accordance with the terms of the mortgage throughout 1965 and 1966.

[3] Conversion of advances to capital stock as of Feb. 28, 1963.

[4] Paid-in capital.

[5] In June 1965, Oak Manor Motel, Inc., acquired Oak Manor Motor Lodge from an unrelated party at a purchase price of approximately $1,575,000. Of the total price, approximately $1,032,000 was paid by assuming the outstanding mortgage indebtedness to which the real estate was then subject. The balance, approximately $543,000, was paid in cash at the closing. The cash balance was paid by Oak Manor Motel, Inc., from the original capital contributed by petitioner ($200,000) and an advance by petitioner in June 1965, in the amount of approximately $393,000. The mortgages subject to which the property was acquired provided for the payment of principal and interest by constant-level monthly payments in the total amount of $8,909. These monthly payments were made by Oak Manor Motel, Inc., in accordance with the terms of the mortgages for the balance of 1965 and 1966.

[6] See fn. 4 supra.

[7] See fn. 3 supra.

[8] Total amount invested on May 31, 1965, when the subsidiary was liquidated into petitioner.

In expanding its operations through subsidiaries, petitioner patterned the capital structure of its subsidiaries according to the prevailing norm in the motel-hotel industry. The industry standard was that the owner should contribute between 20 and 30 percent of the capital required by the corporation with the remainder to be obtained through other financing arrangements. If followed, the norm would approximate a ratio of 1 : 3 between owner's equity and noncapitalized funding.

In line with petitioner's long-standing predilection for internal financing, a major portion of the noncapitalized funding of the subsidiaries was accomplished by means of advances from petitioner to the subsidiaries. The advances made by petitioner did not bear interest and did not have definite maturity dates. On the books of the subsidiaries, the advances were reflected as loans payable to Kahler, and on Kahler's books the corresponding entries were loans receivable from the respective subsidiaries.

During the years here involved, there were balances outstanding with respect to the advances Kahler had made to four of its subsidiaries: KFM Hotel Co. (KFM), Mankato Inn Towne Motel, Inc. (Mankato), Oak Manor Motel, Inc. (Oak Manor), and Owatonna Inn Towne Motel, Inc. (Owatonna). At the beginning of the taxable period, three of the four subsidiaries had advances outstanding from petitioner in the amount of $1,675,000 (Oak Manor received no advances until July 1, 1965). During the taxable period, petitioner advanced $932,637.88 to the four subsidiaries and the four subsidiaries repaid the petitioner $519,637.88 on the outstanding advances. At the close of the taxable period, the four subsidiaries had a combined balance of advances outstanding of $2,088,000.

The subsidiary corporations utilized the advances from Kahler for working capital or for the purchase or construction of capital items (e.g., acquisition of hotel-motel property and/or erection of buildings thereon). With the exception of a short-term loan from Owatonna to KFM, the subsidiaries did not lend their funds to other entities. The following table shows, for each of the four subsidiaries, the capital investment of Kahler in the subsidiary and the range in the balance of outstanding "advances" to each subsidiary during the calendar years 1965 and 1966:

| Subsidiary | Capital investment | Range of advances in 1965 | Range of advances in 1966 |
|---|---|---|---|
| KFM Hotel Co | $100,000 | $295,000—$325,000 | $293,000—$335,000 |
| Mankato Inn Towne Motel, Inc | 250,000 | 785,000—865,000 | 775,000—1,195,000 |
| Oak Manor Motel, Inc | 200,000 | 0—365,000 | 215,000—335,000 |
| Owatonna Inn Towne Motel, Inc | 200,000 | 425,000—485,000 | 385,000—425,000 |

At all times material herein, petitioner charged each subsidiary a "management fee" which was intended to compensate petitioner for services which it rendered to the subsidiaries in such areas as advertising, guest referral, sales, central services, and management. The manager of each subsidiary was paid by petitioner in order to have these managers available for transfer to other subsidiaries without major changes in their compensation schedules and to develop a sense of loyalty to the parent company. In 1965, the management fee, with the exception of one subsidiary, approximated the base salary paid by petitioner to the manager of that subsidiary. Commencing in 1966, the management fee was approximately equal to the manager's base salary plus 6 percent of the subsidiary's room sales. The following table shows the management fees reported by petitioner as income from the subsidiaries and the manager's salaries paid by petitioner during the years 1965 and 1966:

| Subsidiary | Management fee reported | Manager's salary paid |
|---|---|---|
| | *1965* | |
| KFM | $24,000 | $12,650 |
| Mankato | 8,400 | 10,395 |
| Oak Manor (5 months) | 5,000 | 0 |
| Owatonna | 7,200 | 9,102 |
| | *1966* | |
| KFM | 36,265 | 19,894 |
| Mankato | 25,175 | 16,927 |
| Oak Manor | 35,265 | 19,320 |
| Owatonna | 20,125 | 15,394 |

A predominant portion of the total funds available to Kahler for its expansion was generated internally—through operating profits, depreciation, investments, and the sale of certain hotel properties. Kahler also was in the practice of making capital improvements to its properties. When the company embarked on its expansion venture, additional financing was obtained in case the internal cash flow would be inadequate to handle the expansion that was to ensue. This is not to say, however, that the expansion was facilitated with borrowed capital. Although some borrowed capital may have passed through to the subsidiaries, the primary cash source during this expansion period was Kahler's internal cash flow.

During 1965 and 1966, Kahler's wholly owned subsidiary, Lawler's, Inc., made interest-free advances to petitioner. To allow for the absence of interest, petitioner reduced the management fee it charged to Lawler's in these years.

With respect to the four subsidiaries in question here, however, the management fee in no way reflected any interest with respect to the funds advanced by petitioner to these subsidiaries.

On or about October 5, 1961, petitioner, Owatonna, and Mankato executed a promissory note and mortgage indenture in favor of the Northwestern Mutual Life Insurance Co. in consideration of a loan in the maximum amount of $4,500,000. The principal sum outstanding carried an interest rate of 6 percent per annum until paid. The loan was obtained in part to assist in financing the construction of the Owatonna Inn Towne Motel; the Mankato Inn Towne Motel; a 300-car parking ramp, a retail store, and bank building adjacent to the Kahler Hotel; equipment for the Owatonna and Mankato motel properties; and the remodeling of the Kahler Hotel lobby.

The cash fund available to petitioner as a result of this mortgage and promissory note was not drawn down immediately after the execution of the note and mortgage. By June 30, 1963, petitioner had drawn down approximately $3,500,000. All amounts drawn down under the mortgage were paid by the lender to petitioner, and all repayments of principal and interest under the mortgage note were made by petitioner to the lender. Although Owatonna and Mankato formally executed the note and mortgage and their properties helped to secure the mortgage, neither subsidiary independently drew down any funds nor committed itself to repayment of any part of the principal or interest.

On March 14, 1962, petitioner entered into a loan agreement with the First National Bank of Minneapolis which authorized an unsecured term loan of $1 million to petitioner. This fund was drawn down in full by petitioner as of the close of the 1962 taxable year.

On July 30, 1965, petitioner executed a promissory note in the amount of $600,000 with the First National Bank, the effect of which was to increase the funds available under the 1962 loan agreement to $1,600,000. The promissory note executed by petitioner in favor of First National Bank at this time carried an interest rate of 5½ percent per annum.

In June 1965, petitioner's Oak Manor subsidiary acquired the Oak Manor Motor Lodge in Fargo, N.D. Of the total purchase price of approximately $1,575,000, the subsidiary assumed the outstanding mortgage indebtedness to which the real estate was then subject and paid the balance in cash. The cash balance paid by Oak Manor consisted of original capital contributed by petitioner and funds advanced to Oak Manor after its incorporation.

Subsequent to the taxable years involved herein, petitioner reviewed the capitalization of all of its wholly owned subsidiaries. It was determined, because of certain financial and operational factors, that a portion of the advances to some of the subsidiaries (including Mankato, one of the subsidiaries under scrutiny here) should be

capitalized. Accordingly, the following adjustments were made on November 30, 1968:

| Subsidiary | Capital investment | Debt capitalized | Total capital | Debt remaining |
|---|---|---|---|---|
| Mankato | $250,000 | $500,000 | $750,000 | $460,000 |
| Hibbing Inn Towne Motel, Inc. (Hibbing) | 191,500 | 500,000 | 691,500 | 445,500 |
| Albert Lea Inn Towne Motel, Inc. (Albert Lea) | 180,000 | 450,000 | 630,000 | 417,500 |

As of December 31, 1968, each of the subsidiaries involved in this case had manifested to petitioner an expectation of repayment by virtue of their reduction of the balances outstanding to petitioner on the advances. The following is a comparison of the balances outstanding to petitioner at certain relevant times:

THE KAHLER CORPORATION

Loans to Subsidiaries 1964–68

| Date | KFM | Mankato | Owatonna | Oak Manor |
|---|---|---|---|---|
| Dec. 31, 1964 | $325,000 | $865,000 | $485,000 | 0 |
| July 31, 1965 | 295,000 | 805,000 | 460,000 | $565,000 |
| Dec. 31, 1966 | 293,000 | 1,195,000 | 385,000 | 215,000 |
| Dec. 31, 1968 | 165,000 | [1] 460,000 | 250,000 | 0 |

[1] On Nov. 30, 1968, $500,000 reclassified as capital.

Oak Manor had completely satisfied its obligation of repayment to petitioner by November 30, 1968. Owatonna and KFM each had reduced its obligation by approximately 50 percent by December 31, 1968. Even Mankato, subsequent to the capital reclassification on November 30, 1968, had reduced its obligation by $235,000.

By virtue of his authority under section 482 of the Code, the respondent here seeks to "allocate" to the petitioner a 5-percent interest charge based on the balances of the advances outstanding with respect to four subsidiaries during each month of the taxable years 1965 and 1966.

Respondent's deficiency notice for the calendar year 1965 explained the adjustments made pursuant to section 482 of the Code. The deficiency notice reads in pertinent part as follows:

In the year 1965 you made advances to four of your subsidiaries, KFM Hotel Co., Mankato Inn Towne Motel, Inc., Oak Manor Motel, Inc. and Owatonna Inn Towne, Inc., on which no interest was charged. Under the authority of section 482 of the 1954 Code additional interest income is allocated to you in the amount of $87,667.67. It is determined that this allocation is necessary to prevent the evasion of taxes and to clearly reflect your income and the income of the four subsidiaries mentioned above.

The explanation of the 1966 adjustments was identical to the previous year's explanation and the interest "allocation" for 1966 was $94,942.38.

The interest "allocated" by respondent to petitioner for the taxable years was computed by using a 5-percent interest factor on the outstanding balance of the advances on a month-to-month basis for the years 1965 and 1966.

|  | KFM | Mankato | Oak Manor | Owatonna |
|---|---|---|---|---|
| *1965* |  |  |  |  |
| January 31 | $1,354.18 | $3,604.20 | | $2,020.85 |
| February 28 | 1,270.84 | 3,541.69 | | 1,979.18 |
| March 31 | 1,270.84 | 3,541.69 | | 1,979.18 |
| April 30 | 1,229.18 | 3,458.36 | | 1,979.18 |
| May 31 | 1,229.18 | 3,458.36 | | 1,979.18 |
| June 30 | 1,270.84 | 3,458.36 | | 1,979.18 |
| July 31 | 1,229.18 | 3,354.19 | $1,520.85 | 1,916.68 |
| August 31 | 1,229.18 | 3,354.19 | 1,458.34 | 1,916.68 |
| September 30 | 1,229.18 | 3,354.19 | 1,375.34 | 1,854.18 |
| October 31 | 1,354.18 | 3,312.53 | 1,312.51 | 1,791.68 |
| November 30 | 1,312.51 | 3,270.86 | 1,395.84 | 1,770.85 |
| December 31 | 1,312.51 | 3,270.86 | 1,395.84 | 1,770.85 |
| Total | 15,291.80 | 40,979.48 | 8,458.72 | 22,937.67 |
| *1966* |  |  |  |  |
| January 31 | 1,312.51 | 3,229.19 | 1,395.84 | 1,770.85 |
| February 28 | 1,312.51 | 3,229.19 | 1,395.84 | 1,770.85 |
| March 31 | 1,312.51 | 3,229.19 | 1,395.84 | 1,770.85 |
| April 30 | 1,270.84 | 3,229.19 | 1,333.34 | 1,729.18 |
| May 31 | 1,270.84 | 3,229.19 | 1,260.01 | 1,729.18 |
| June 30 | 1,270.84 | 3,270.86 | 1,208.34 | 1,770.85 |
| July 31 | 1,270.84 | 3,416.69 | 1,104.18 | 1,770.85 |
| August 31 | 1,270.84 | 3,666.70 | 1,104.18 | 1,770.85 |
| September 30 | 1,270.84 | 4,062.53 | 1,104.18 | 1,770.85 |
| October 31 | 1,395.84 | 4,375.03 | 958.34 | 1,666.68 |
| November 30 | 1,345.84 | 4,770.87 | 895.84 | 1,604.18 |
| December 31 | 1,220.84 | 4,979.21 | 895.84 | 1,604.18 |
| Total | 15,525.09 | 44,687.84 | 14,041.77 | 20,687.68 |

Revenue Agent Richard Muyres conducted respondent's examination of petitioner's 1965 and 1966 income tax returns. Muyres also conducted the examination of the income tax returns of petitioner's subsidiaries: KFM, Mankato, Oak Manor, and Owatonna for the taxable years ended November 30, 1965, and November 30, 1966. Muyres made proposed correlative adjustments for each of said subsidiaries increasing interest expense to reflect the accrual of interest imputed on loans or advances made by petitioner during the subsidiaries' taxable years ended November 30, 1965, and November 30, 1966. Respondent has not made any refund of taxes, if any result from said proposed correlative adjustments to said subsidiaries, nor has he made any final determination of tax liability of said subsidiaries as a result of said proposed correlative adjustments.

The following table shows the taxable income reported by some of petitioner's subsidiaries on their income tax returns for the taxable years ended November 30, 1965, and November 30, 1966, the amount of additional interest expense proposed as a correlative adjustment by the respondent for each of said subsidiaries and the resulting tax-

able income as proposed by respondent for said fiscal years for each subsidiary:

| Subsidiary | Taxable income per return | Proposed interest expense adjustment | Taxable income adjusted |
|---|---|---|---|
| *FYE Nov. 30, 1965* | | | |
| KFM | $45,922.59 | ($13,979.29) | $31,943.30 |
| Mankato | 35,452.00 | (37,708.62) | (2,256.62) |
| Oak Manor | 13,218.17 | (7,062.88) | 6,155.29 |
| Owatonna | 33,965.77 | (21,166.82) | 12,798.95 |
| *FYE Nov. 30, 1966* | | | |
| KFM | 38,580.28 | (15,616.76) | 22,963.52 |
| Mankato | 47,726.17 | (42,979.49) | 2,490.06 |
| Net operating loss deduction | | (2,256.62) | |
| Oak Manor | 43,908.89 | (14,541.77) | 29,367.12 |
| Owatonna | 40,856.76 | (20,854.35) | 20,002.41 |

The reported taxable income of petitioner for the taxable years in question is as follows:

| Year | Taxable income |
|---|---|
| 1965 | $717,321.59 |
| 1966 | 1,055,223.29 |

OPINION

During the taxable years 1965 and 1966, petitioner advanced $932,-637.88 to four of its subsidiaries. These advances were similar to those made in previous years by petitioner. No interest was charged in respect of the advances and the subsidiaries utilized the advanced funds for working capital. The Commissioner determined, pursuant to the authority of section 482 [1] of the Code and the regulations [2] thereunder,

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.
SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.
In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[2] Sec. 1.482-1 [Income Tax Regs.] Allocation of income and deductions among taxpayers.
(d) *Method of allocation.* * * *

\* \* \* \* \* \* \*

(4) If the members of a group of controlled taxpayers engage in transactions with one another, the district director may distribute, apportion, or allocate income, deductions, credits, or allowances to reflect the true taxable income of the individual members under the standards set forth in this section and in § 1.482-2 notwithstanding the fact that the ultimate income anticipated from a series of transactions may not be realized or is realized during a later period. For example, if one member of a controlled group sells a product at less than an arm's length price to a second member of the group in one taxable year and the second member resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, notwithstanding that the second member of the group had not realized any gross income from the resale of the product in the first year. *Similarly, if one member of a group lends money to a second member of the group in a taxable year, the district director may make an appropriate allocation to*

that interest income should be "allocated" to petitioner in an amount equal to 5 percent of the balances on the advances outstanding to the four subsidiaries at the end of each month of the taxable period. The petitioner argues that this determination is unreasonable and arbitrary

*reflect an arm's length charge for interest during such taxable year even if the second member does not realize income during such year. The provisions of this subparagraph apply even if the gross income contemplated from a series of transactions is never, in fact, realized by the other members.* [T.D. 6595, filed 4/13/62, amended by T.D. 6952, filed 4/15/68. Emphasis supplied.]

Sec. 1.482–2 [Income Tax Regs.] Determination of taxable income in specific situations.

(a) *Loans or advances*—(1) *In general.* Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, *the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.* [Emphasis supplied.]

(2) *Arm's length interest rate.* For the purposes of this paragraph, the arm's length interest rate shall be the rate of interest which was charged, or would have been charged at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors will be considered, including the amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans. If the creditor was not regularly engaged in the business of making loans or advances of the same general type as the loan or advance in question to unrelated parties, the arm's length rate for purposes of this paragraph shall be—

(i) The rate of interest actually charged if at least 4 but not in excess of 6 percent per annum simple interest,

(ii) 5 percent per annum simple interest if no interest was charged or if the rate of interest charged was less than 4, or in excess of 6 percent per annum simple interest, unless the taxpayer establishes a more appropriate rate under the standards set forth in the first sentence of this subparagraph. For purposes of the preceding sentence if the rate actually charged is greater than 6 percent per annum simple interest and less than the rate determined under the standards set forth in the first sentence of this subparagraph, or if the rate actually charged is less than 4 percent per annum simple interest and greater than the rate determined under the standards set forth in the first sentence of this subparagraph, then the rate actually charged shall be deemed to be a more appropriate rate under the standards set forth in the first sentence of this subparagraph. Notwithstanding the other provisions of this subparagraph if the loan or advance represents the proceeds of a loan obtained by the lender at the situs of the borrower the arm's length rate shall be equal to the rate actually paid by the lender increased by an amount which reflects the costs or deductions incurred by the lender in borrowing such amounts and making such loans, unless the taxpayer establishes a more appropriate rate under the standards set forth in the first sentence of this subparagraph.

(3) *Loans or advances to which subparagraph (1) applies.* Subparagraph (1) of this paragraph applies to all forms of bona fide indebtedness and includes:

(i) Loans or advances of money or other considerations (whether or not evidenced by a written instrument), and

(ii) Indebtedness arising in the ordinary course of business out of sales, leases, or the rendition of services by or between members of the group, or any other similar extension of credit.

Subparagraph (1) of this paragraph does not apply to alleged indebtedness which was in fact a contribution of capital or a distribution by a corporation with respect to its shares. The interest period shall commence at the date the indebtedness arises, except that with respect to indebtedness described in subdivision (ii) of this subparagraph that is not evidenced by a written instrument requiring payment of interest, the interest period shall not commence until a date 6 months after the date the indebtedness arises, or until a later date if the taxpayer is able to demonstrate that either it or others in its industry, as a regular trade practice, permit comparable balances in the case of similar transactions with unrelated parties to remain outstanding for a longer period without charging interest. For the purpose of determining the period of time for which a balance is outstanding, payments or credits shall be applied against the earliest balance outstanding, unless the taxpayer applies such payments or credits in some other order on its books in accordance with an agreement or understanding of the parties if the taxpayer

because the subsidiaries did not directly realize any income on the advances.

The Tax Court has consistently held that a prerequisite to the Commissioner's allocation authority under section 482 is the existence of an item of income, deduction, credit, or allowance which had its genesis in the particular transaction between the related parties. *Smith-Bridgman & Co.*,[3] 16 T.C. 287 (1951), acq. 1951–1 C.B. 3; *PPG Industries, Inc.*,[4] 55 T.C. 928 (1970); *Huber Homes, Inc.*,[5] 55 T.C. 598 (1971).

can demonstrate that either it or others in its industry, as a regular trade practice, enter into such agreements or understandings.

(b) *Performance of services for another*—(1) *General rule.* Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of, or on behalf of another member of the group without charge, or at a charge which is not equal to an arm's length charge as defined in subparagraph (3) of this paragraph, the district director may make appropriate allocations to reflect an arm's length charge for such services. [T.D. 6952, filed 4/15/68; T.D. 6964, filed 7/24/68.]

[3] In *Smith-Bridgman & Co.* the petitioner, a wholly owned subsidiary of Continental, made interest-free loans to its parent. The Commissioner included in the taxpayer's gross income an amount representing a 4-percent interest charge in respect of the loan. We disapproved of the determination saying:

"In support of his action the respondent argues that Continental, in securing these non-interest-bearing loans from petitioner, was enabled to relieve itself from paying interest on its outstanding debentures; and, furthermore, he argues, petitioner could have loaned the funds which Continental borrowed without interest to third parties at 4 per cent interest. Therefore, in order to prevent evasion of taxes and to clearly reflect the income of such related businesses, he has "allocated" to petitioner part of the income of its parent, in the exercise of the discretion conferred by section 45 [the predecessor of current sec. 482] of the code. The decisions involving section 45 make it clear that its principal purpose is to prevent the manipulation of or improper shifting of gross income and deductions between two or more organizations, trades, or businesses. Its application is predicated on the existence of income. The courts have consistently refused to interpret section 45 as authorizing the creation of income out of a transaction where no income was realized by any of the commonly controlled businesses. *Tennessee-Arkansas Gravel Co.* v. *Commissioner*, 112 Fed. (2d) 508; *E. C. Laster*, 43 B.T.A. 159, modified on other issues, 128 Fed. (2d) 4; *Epsen-Lithographers, Inc.* v. *O'Malley*, 67 Fed. Supp. 181; cf. *Hugh Smith, Inc.*, 8 T.C. 660, affd., 173 Fed. (2d) 224, certiorari denied, 337 U.S. 918. [16 T.C. at 293.]"

[4] In *PPG Industries, Inc.*, the Commissioner attempted to allocate interest to the taxpayer for 1960 from a wholly owned Brazilian holding company (Pittsburco) which was indebted to the taxpayer as a result of advances made prior to, and in, 1940. The holding company's 1960 income consisted of dividends, interest, and gain from the sales of bonds. We rejected the allocation relying on *Smith-Bridgman* and concluded:

"We cannot possibly conceive even the most tenuous connection between this 1940 balance and Pittsburco's income some 20 years later in the form of dividends ($141,051), interest ($14,508), and gain from the sale of bonds ($9,476). We cannot agree with the respondent that these sundry gains and items of income are attributable to the 1940 advances. As this Court indicated in the *Smith-Bridgman* case, the courts in this area of the law have consistently refused to authorize the creation of income *out of a transaction* where no income was realized. We do not see how the advances made to Pittsburco in 1940 can be considered as the transaction out of which came the 1960 allocable income. We cannot believe that section 482 and the regulations thereunder are to be applied in so broad a manner. To so apply the statute constitutes, we believe, an abuse of the respondent's discretion. * * * [55 T.C. at 1009–1010]"

[5] The taxpayer in *Huber Homes* was in the business of constructing and selling houses. The taxpayer transferred certain unsold houses at cost to its wholly owned subsidiary (Huber Investment) to be converted to rental properties. The Commissioner determined that income should be allocated to the taxpayer in an amount equal to the difference between the fair market value of the transferred houses and their cost to the subsidiary. The contention was that an arm's-length transaction between the parties would have

Essential to the application of this statute is the distribution, apportionment, or allocation of one of the specifically enumerated items in section 482, realized or incurred at some time within the controlled group. *Tennessee-Arkansas G. Co.* v. *Commissioner*, 112 F. 2d 508, 510 (C.A. 6, 1940) ; *Huber Homes, Inc., supra* at 607. Where the controlled group, for example, has realized no income from the particular transaction within the group, we have undeviatingly held section 482 to be inapposite. *Smith-Bridgman & Co., supra; PPG Industries, Inc., supra; Huber Homes, Inc., supra.*

The Second Circuit, on the other hand, has now ruled that such an imputation of interest income under section 482 is warranted, even if the transaction in question does not cause income to be realized within the controlled group. *B. Forman Co., Inc.* v. *Commissioner*, 453 F. 2d 1144 (C.A. 2, 1972), affirming in part and reversing in part 54 T.C. 912 (1970). In *Forman*, the petitioners, two corporations not having common shareholders, officers, or directors, formed a third corporation, Midtown, to build and operate a shopping center. The petitioners each advanced $1 million loans, interest free, to Midtown and during the taxable years in question, Midtown paid no interest on these advances. Our Court, below, found the requisite control for the operation of section 482 to be absent since the petitioners were not related through common ownership; hence, with section 482 held inapposite because of the absence of "control," we found it unnecessary to reach the question of the Commissioner's authority to impute interest income under section 482 and whether this case would fall within the ambit of previous Tax Court cases on this issue.

The Second Circuit reversed on the control issue, finding the common interest of petitioners in establishing Midtown and acting in concert to advance interest-free funds to it sufficient to allow section 482 to operate. After citing cases holding that one related party is not required to charge another related party interest on a loan,[6] and our precedent holding section 482 inapposite in the interest-free loan situation between related parties where no income was realized, the Second

---

resulted in income to the taxpayer. Both the taxpayer and the subsidiary suffered net losses for the taxable year in question.

We rejected the Commissioner's determination stating :

"Huber Investment did not resell the houses transferred to it, and thereby receive a profit that was in fact attributable to petitioner but which was artificially channeled to Huber Investment by means of an intercompany sale at cost. Moreover, in contrast to his position in the foregoing cases, the Commissioner does not here contend that any of Huber Investment's gross rental income was not earned by it or that any portion of *its* income should be allocated to Huber Homes. Rather, the Commissioner is purporting to exercise his authority under section 482 to create income, i.e., to charge petitioner with the income it would have realized had its sale to Huber Investment been at arm's length. We hold that this determination is not authorized by section 482. [55 T.C. at 607.]"

[6] *Combs Lumber Co.*, 41 B.T.A. 339 (1940) ; *Society Brand Clothes, Inc.*, 18 T.C. 304 (1952) ; *Atchison, Topeka & Santa Fe Railway Co.*, 36 T.C. 584 (1961).

Circuit then proceeded to decide the question not considered below. It held:

To the extent that the above cases cited by taxpayers may be read as holding that no interest can be allocated under § 482 under the facts of this case, they are not in accord with either economic reality, or with the declared purpose of section 482. They seriously impair the usefulness of § 482. Those cases may be correct from a pure accounting standpoint. Nevertheless, interest income may be added to taxpayers' incomes, as long as a correlative adjustment is made to Midtown, for then the true taxable income of all involved will be properly reflected. Treas. Reg. § 1.482–1(a)(6) provides:

"The term 'true taxable income' means * * * the taxable income * * * which would have resulted to the controlled taxpayer, had it in the conduct of its affairs * * * dealt with the other member * * * at arm's length. It does not mean the income * * * or allowances, resulting to the controlled taxpayer by reason of the particular * * * transaction * * * the controlled taxpayer * * * chose to make (even though such * * * transaction * * * may be legally binding upon the parties thereto)."

Treas. Reg. § 1.482–2(a) provides:

"Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest * * * the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan * * *".

These regulations must prevail, for they are entirely consistent with the scope and purpose of § 482. The instant loans without interest are obviously not at arm's length, since no unrelated parties would loan such large sums without interest. The allocation of the interest income to taxpayers was necessary in order to properly reflect their taxable incomes. [453 F.2d at 1156.]

With due respect, we are of the opinion that the Second Circuit has incorrectly delineated *both* the purpose of section 482 and the circumstance required before the statute can operate. Hence, we opt to follow the interpretation of the intent and usage of section 482 expressed in previous Tax Court opinions on this issue.

## The Purpose of Section 482

The predecessor of section 482, section 45, was incorporated into the tax law by the Revenue Act of 1928. The concise legislative history of section 45 in the committee reports on the 1928 Act is as follows:

SECTION 45. ALLOCATION OF INCOME AND DEDUCTIONS.

Section 45 is based upon section 240(f) of the 1926 Act, broadened considerably in order to afford adequate protection to the Government made necessary by the elimination of the consolidated return provisions of the 1926 Act. The section of the new bill provides that the Commissioner may, in the case of two or more trades or businesses owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking"), and in order clearly to reflect their true tax liability.

It has been contended that section 240(f) of the 1926 Act permits what is in effect the filing of a consolidated return by two or more trades or businesses, even though they are not affiliated within the meaning of the section. Section 45 of the bill prevents this erroneous interpretation by eliminating the phrase "consolidate the accounts." [H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17, reprinted in 1939–1 C.B. (Part 2) 395; S. Rept. No. 960, 70th Cong., 1st Sess., p. 24, reprinted in 1939–1 C.B. (Part 2) 426.]

The purpose of the statute is effectuated by the Commissioner allocating income, deductions, credits, and allowances to the entity which, *in fact*, earned the income, incurred the deduction, or was entitled to the credit or allowance, as the case may be. *Huber Homes, Inc., supra* at 605. The Commissioner may make such an allocation only where an *actual* shifting of one of the enumerated items has taken place, not just because commonly controlled corporations have the *power* to devise such artifices. H. Rept. No. 2, 70th Cong., 1st Sess., *supra;* S. Rept. No. 960, 70th Cong., 1st Sess., *supra; Ballentine Motor Co.* v. *Commissioner*, 321 F.2d 796 (C.A. 4, 1963), affirming 39 T.C. 348 (1962); *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964), acq. 1964–2 C.B. 4; *Hamburgers York Road, Inc.*, 41 T.C. 821 (1964), acq. 1965–2 C.B. 5; *V. H. Monette & Co.*, 45 T.C. 15 (1965), affd. 374 F. 2d 116 (C.A. 4, 1967); *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073 (1969), affd. 452 F. 2d 137 (C.A. 7, 1971).

Section 482 does not punish the mere existence of common control or ownership. The statute assists in the prevention of income distortion and the evasion of taxes through the excerise of that common control. *Asiatic Petroleum Co. (Delaware) Ltd.*, 31 B.T.A. 1152 (1935), affd. 79 F. 2d 234 (C.A. 2, 1935), certiorari denied 296 U.S. 645 (1935); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953); *Bush Hog Manufacturing Co., supra; Marc's Big Boy-Prospect, Inc., supra.* Therefore, the result of the statute's operation would be a proper accounting of which entity should report the particular item realized within the related group.

The Commissioner has considerable discretion in applying section 482 and his determination must be sustained unless he has abused his discretion and petitioner proves such determination to be unreasonable, arbitrary, or capricious. *Pauline W. Ach*, 42 T.C. 114, 125–126 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966); *Bush Hog Manufacturing Co., supra; Marc's Big Boy-Prospect, Inc., supra.*

If the record before this Court fails to support the allocation, then we must conclude that the Commissioner abused his discretion. *V. H. Monette & Co., supra* at 36–37.

### The Circumstance in Which Section 482 Operates

The statute prevents the evasion of taxes "by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of milking" the related entities. If a framework exists where profits have been shifted, fictitious sales made, or other "milking" devices employed, section 482 would then be apposite and would prevent the deflection of one of the enumerated items to an improper entity.

The test is not simply whether or not correlative adjustments have been made to properly show the true taxable income of all the related parties concerned.[7] Rather, the question which must be asked is whether or not an item exists, realized out of the particular transaction between the related entities, which has been improperly deflected to the wrong entity.

When this analysis was applied by this Court to the facts of *Smith-Bridgman*, *PPG Industries, Inc.*, and *Huber Homes*, we found that the transactions in each of those cases did *not* produce an item of income which was improperly deflected to the wrong entity.

### The Kahler Corporation Advances

In the situation before us, interest-free advances within the related Kahler group were the raison d'être for the Commissioner's invocation of his section 482 authority. Unquestionably, the four Kahler subsidiaries utilized the advanced funds for productive purposes.[8] Yet, despite the very short time span between the advances and the taxable years in question, the Commissioner has not sought to allocate, in whole or in part, income realized by the subsidiaries in 1965 or 1966 from the use or consumption of these advances. In this respect, we are given a situation equivalent to the stance of the *Smith-Bridgman*,

---

[7] The Internal Revenue Service had originally acquiesced in the *Smith-Bridgman* case, 1951–1 C.B. 3. This acquiescence, however, was explained away in Rev. Rul. 67–79, 1967–1 C.B. 117, at a time when the Service was drafting the section 482 regulations which it has relied on in the present case. The ruling explained that the acquiescence in *Smith-Bridgman* (and the Service's position on the *Tennessee-Arkansas Gravel Co., supra,* decision of the Sixth Circuit) was "intended only to concur in the proposition that appropriate adjustments are to be made to the incomes of both members of the group affected to reflect the allocation." However, in *Huber Homes* we reaffirmed the no-creation-of-income principle and dismissed the Commissioner's distinction of the *Smith-Bridgman* and *Tennessee-Arkansas Gravel Co.* cases. Our decision in *Huber Homes,* therefore, rested on a much broader ground than the Commissioner's "correlative adjustment" rationale.

[8] The Pittsburco subsidiary in *PPG Industries, Inc.,* advantageously utilized the funds advanced to it by its parent. However, the connection between these 1940 (and prior) advances and the subsidiary's 1960 income was so tenuous that we were unable to consider these advances as transactions out of which Pittsburco realized income in 1960. Similarly, the subsidiary in *Huber Homes* intended to derive rental income from the houses purchased at cost from its parent. In this case, nevertheless, the Commissioner only questioned the cost sale and the issue of the rental income derived from these houses was not before the Court.

*PPG Industries, Inc.*, and *Huber Homes* cases in our Court. In those cases, the Commissioner did not assert that the improper reflection of income resulted from the use or consumption of the advanced funds (*Smith-Bridgman* and *PPG Industries, Inc.*) or assets purchased at cost (*Huber Homes*); rather, the improper reflection was deemed to arise from the contention that had the petitioners in these cases dealt at arm's length with their subsidiaries, an item of income *would have* been realized.

Therefore, absent any question with respect to the actual "earning" of the income by the subsidiaries or whether such income was derived from the use or consumption of the advances, we are confronted with the precise issue before us in *Smith-Bridgman*, *PPG Industries, Inc.*, and *Huber Homes*. As with the transactions in these previous cases, the Kahler advances did not, alone, represent a *transaction out of which income was realized*. In the absence of income within the related group as an outcome of these advances, there does not exist an item of income which was improperly deflected to petitioner. The petitioner has not evaded taxes by the shifting of profits, the making of a fictitious sale, or the employment of any "milking" device.

The income which the Commissioner has "allocated" to petitioner was created solely through the application of the regulations promulgated under section 482 and did not exist as a result of the advances themselves. The legislative history of section 482 does not reveal in any respect a congressional intent to require an arm's-length charge on an interest-free loan between related parties where an improper deflection of income is not factually substantiated. Absent a declared congressional purpose in section 482 to this end, the imposition of such a charge without the deflection of realized income within the group would be tantamount to an unreasonable check on the mere existence of common control or ownership.

The application of this statute and the regulations thereunder, in this fashion, and to this extent, reaches beyond the intent and purpose of section 482 and constitutes an abuse of the Commissioner's discretion.

The Code treats "imputed" income specifically, rather than generally leaving the ground rules for such imputation to administrative regulation. In section 483, Congress has provided for the imputation of interest income in deferred payment sales situations. Under the provisions of section 1232, the Tax Reform Act of 1969 now requires a bondholder to include a ratable portion of the original issue discount on a bond each year. If an interest charge is to be placed indiscriminately on loans between related entities without consideration of whether the loans produced realized income, we feel that it is the Congress, and not this Court, which should so provide.

In reaching our conclusion, we wish to make it clear that we rest our decision herein on the fact that the respondent, in his deficiency notice, at trial, and on brief, limited himself to the issue of straight imputation of interest without regard to whether the interest-free, borrowed funds produced income. Consequently, we do not have before us the issue which we faced and decided this day in *Kerry Investment Co.*, 58 T.C. 479 (1972). We hold, therefore, that the imputation of income by the Commissioner with respect to the Kahler advances was unreasonable and arbitrary and we do not sustain the determination of the Commissioner.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

FEATHERSTON, *J.*, dissenting: In view of the regulations (secs. 1.482–1 (a) (6), (b), (c), (d) (4), and 1.482–2(a), Income Tax Regs.), promulgated after many of the cases relied upon by the majority were decided, I respectfully dissent. My views are stated in a dissenting opinion in *Kerry Investment Co.*, 58 T.C. 479 (1972).