CAYUGA SERVICE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentCayuga Service, Inc. v. CommissionerDocket No. 6442-70.United States Tax CourtT.C. Memo 1975-4; 1975 Tax Ct. Memo LEXIS 368; 34 T.C.M. (CCH) 18; T.C.M. (RIA) 750004; January 13, 1975, Filed. *368 Interest-free advances were made by petitioner, a corporation, to VLA, VSD and YS corporations. Held, (1) petitioner and the three corporations were controlled corporations within the purview of section 482, both at the time of the advances and for the years in issue, 1966 and 1967; (2) the advances determined to be nonarm's-length loans not investments; and (3) following B. Forman Company v. Commissioner, 453 F.2d 1144 (C.A. 2, 1972), certiorari denied 407 U.S. 934 (1972) (Golsen rule applied), respondent had the power under section 482 to allocate gross income to petitioner measured by five percent of the loans so as to clearly reflect petitioner's income. Robert V. Hunter, for the petitioner. John D. Steele, Jr., for the respondent. IRWINMEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies of $ 5,693.14 and $ 6,158.35 in petitioner's income tax for the taxable years 1966 and 1967, respectively. The sole issue for our determination is whether respondent properly applied section 4821*369 to allocate interest income to petitioner for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly. Petitioner Cayuga Service, Inc. (hereinafter referred to as "Cayuga" or "petitioner") was incorporated under the laws of the State of New York on June 17, 1954, and since its incorporation its principal business has been the hauling of rock salt as a contract carrier. At the time of the filing of its petition with this Court, petitioner had its principal place of business in South Lansing, N.Y. For the calendar years 1966 and 1967 petitioner filed corporate income tax returns with the district director of internal revenue, Buffalo, N.Y. Highway Materials Co., Inc. (hereinafter referred to as "Highway") was incorporated under the laws of the State of New York on May 1, 1946, to develop the use of and to market rock salt primarily for road purposes during the winter. Louis J. Ettinger, Jr. (sometimes hereinafter referred to as "Ettinger") and his wife, Charlotte W. Ettinger, have been the sole owners of Highway's 100 outstanding shares of class A voting stock, with Louis J. Ettinger, Jr., owning 85 shares and his wife *370 the remaining 15 shares. During the years 1966 and 1967 Highway also had 650 shares of class B nonvoting stock outstanding owned by the following parties: Robert L. Wilkinson70W. W. Parks80John F. Sloat40W. A. Turner20John W. Ettinger (son of Louis J. Ettinger, Jr.)20L. J. Ettinger, III (son of Louis J. Ettinger, Jr.)20Susan E. Oakes (daughter of Louis J. Ettinger, Jr.)20Charlotte W. Ettinger and/or Louis J. Ettinger, Jr.260Louis J. Ettinger, Jr.120Total650 During the years 1953 through 1967 the directors of Highway have been as follows: Louis J. Ettinger, Jr.1953-1967John W. Ettinger1963-1967Charlotte W. Ettinger1953-1967Louis J. Ettinger, III1964-1967John F. Sloat1963-1967A. Leonard Mott1957-1967Bruno Mazza, Jr.1962-1967Ryan P. Oakes (Ettinger's son-in-law)1966-1967M. E. Springer1953-1959Robert L. Wilkinson1957-1964William B. Wilkinson1959-1962During the years 1953 through 1967 the officers of Highway have been as follows: $ M03,00,00,11$ D$ QPresident:$ BLouis J. Ettinger, Jr.$ Y1953-1967$ QVice President:$ BRobert L. Wilkinson$ Y1953-1963$ Q$ BWorth Parks$ Y1959-1960$ Q$ BJohn W. Ettinger$ Y1963-1967$ Q$ BLouis J. Ettinger, III$ Y1963-1965$ QSecretary:$ BJohn F. Sloat$ Y1953-1962$ *371 Q$ BJohn W. Ettinger$ Y1962-1963$ Q$ BHarold D. Hall$ Y1963-1967$ QTreasurer:$ BM. E. Springer$ Y1953-1959$ Q$ BJohn F. Sloat$ Y1959-1965$ Q$ BHarold Hall$ Y1965-1967$ QAsst. Treas.:$ BLouis J. Ettinger, III$ Y1962-1963$ QAsst. Sec.:$ BWilliam W. Parks$ Y1961-1967$ QGen. Manager - Operation:$ BLouis J. Ettinger, III$ Y1965-1967$ QComptroller:$ BJohn F. Sloat$ Y1965-1967$ X Highway's business activity since its formation has generally consisted of purchasing rock salt, primarily from Cayuga Rock Salt Co., Inc. (hereinafter referred to as "Rock Salt"), and shipping it to various warehouse locations in New York where it is stored until needed to fulfill municipal contracts. These municipal contracts are obtained by submitting bids to municipalities who are interested in purchasing salt during the winter for their public highways. Originally Highway conducted business only in New York but since 1960 it has been selling salt to municipalities throughout the northeastern United States. With the exception of certain large chemical customers who buy directly from Rock Salt, Highway has been its exclusive marketing agent for New York. Highway and Rock Salt had a year-to-year contractual *372 agreement whereby Highway would agree to market a certain number of tons of salt for a fixed commission with each yearly contract subject to review and amendment. Since 1959 the principal offices of both Highway and Cayuga have been in the same building in South Lansing, N.Y. Prior to moving to South Lansing both Highway and Cayuga owned or rented building space on adjoining property in Groton, N.Y.Rock Salt's principal shareholders prior to June 17, 1954, were the Frank L. Bolton Estate and Lucie Bolton. Robert L. Wilkinson (sometimes hereinafter referred to as "Wilkinson") is the son of William B. Wilkinson and a nephew of Lucie Bolton, the widow of Frank L. Bolton. During the entire period of the marketing contract between Highway and Rock Salt Lucie Bolton has been president of Rock Salt and William B. Wilkinson its first vice president. Robert L. Wilkinson was first employed by Highway around 1947 as a salesman. This employment was obtained through his father's business relationship with Ettinger. The original purpose of the employment was to allow Wilkinson to become familiar with the marketing and engineering of rock salt. To encourage employees to remain with the company *373 Highway had a plan which permitted some of its employees to become owners of some of its nonvoting capital stock; and under this plan Wilkinson became the owner of 70 shares of class B nonvoting stock.During Wilkinson's early years with Highway most of the rock salt was shipped by rail, but as more and more roads were built and railway transportation began to decline, shipping rock salt by truck became the general mode of transportation. During this period Highway initially purchased its own trucks and transported rock salt from Rock Salt's mine to its customers. As the trucking of salt in the wintertime increased in the early 1950's, the New York Public Service Commission (hereinafter referred to as "PSC") and the Interstate Commerce Commission (hereinafter referred to as "ICC") became concerned with the practice of salt distributors using privately owned trucks to carry salt during peak periods and believed that this practice should be regulated by their respective agencies. Accordingly, they prompted and encouraged the formation and licensing of separate companies to carry the surplus salt that the distributor could not carry in its own trucks. On June 17, 1954, Cayuga was incorporated *374 to haul rock salt as a contract carrier. Upon its formation Cayuga was granted authority by the PSC to haul rock salt and was permitted to lease trucks from third parties for that purpose. The Capital stock of Cayuga, with a stated value of $ 2,000, was originally owned as follows: Louis J. Ettinger, Jr.200Robert L. Wilkinson150William B. Wilkinson50Total400 On May 4, 1961, Wilkinson acquired the 50 shares owned by his father, William B. Wilkinson. During the years 1966 and 1967, the years in issue, there was only one class of capital stock authorized and issued by Cayuga and its shareholders were as follows: Louis J. Ettinger, Jr.50John W. Ettinger50Susan E. Oakes (Ettinger's daughter)50L. J. Ettinger, III50Robert L. Wilkinson200Total Shares Outstanding400During the years 1954 through 1967 the directors of Cayuga were as follows: April 1955 to April 1960 Louis J. Ettinger, Jr., President of the Board Robert L. Wilkinson William B. Wilkinson April 1960 to April 1964 Louis J. Ettinger, Jr. Robert L. Wilkinson William B. Wilkinson April 1964 to April 1967 Louis J. Ettinger, Jr., Chairman of the Board Robert L. Wilkinson A. Leonard Mott (nominated by Ettinger) During the years 1954 *375 through 1967 the officers of Cayuga were as follows: $ M02,00,00$ D$ QApril 1955 to April 1959$ B$ QRobert L. Wilkinson$ B- President$ QLouis J. Ettinger, Jr.$ B- Vice President$ QL. Partello$ B- Secretary-Treasurer$ QApril 1959 to September 7, 1962$ QRobert L. Wilkinson$ B- President$ QLouis J. Ettinger, Jr.$ B- Vice President$ QJohn F. Sloat$ B- Secretary - Treasurer$ QSeptember 7, 1962 to April 1964$ QRobert L. Wilkinson$ B- President$ QJohn W. Ettinger$ B- Vice President$ QLouis J. Ettinger, Jr.$ B- Secretary$ QJohn F. Sloat$ B- Treasurer$ QApril 1964 to April 1966$ QLouis J. Ettinger, Jr.$ B- Chairman of the Board$ QRobert L. Wilkinson$ B- President$ QLouis J. Ettinger, III$ B- Vice President$ QJohn W. Ettinger$ B- Secretary$ QJohn F. Sloat$ B- Treasurer$ QApril 1966 to April 1967$ QRobert L. Wilkinson$ B- President$ QLouis J. Ettinger, III$ B- Vice President$ QHarold D. Hall$ B- Secretary-Treasurer$ QApril 1967 to April 1968$ QRobert L. Wilkinson$ B- President$ QLouis J. Ettinger, III$ B- Vice President$ QHarold D. Hall$ B- Secretary-Treasurer$ QJohn F. Sloat$ B- Controller$ X$ =P The minutes of the shareholders' meetings and the board of directors' meetings demonstrate that *376 Ettinger's employees and/or directors at Highway were in a position to control Cayuga and held all but one of the officer positions during the years involved herein. While this is true, it is clear that Wilkinson handled the day-to-day management of Cayuga and Ettinger played no role in this management except as an advisor in certain instances. While A. Leonard Mott was nominated to the board by Ettinger he was also a close friend of the Wilkinson family. With respect to the board meetings, each director had one vote and there was no agreement in effect requiring unanimity for the transaction of business or to otherwise modify the manner of voting or the power of the directors. There was also no agreement in effect between the shareholders affecting their right to vote their shares. In Highway's annual report to shareholders for 1960, Ettinger referred to Cayuga as an "affiliate company" even though Highway did not own any stock in Cayuga. Turning to Rock Salt, this company was operating its salt mine under a lease which was to expire in the early 1970's.As a result the distributors for Rock Salt were concerned over their future with Rock Salt and some of them began to depart *377 as early as the late 1950's. In April 1959 Chemical Corporation of Springfield, Mass., left Rock Salt and became a salt distributor for Morton Salt Company. The Favor Salt Company also left Rock Salt to become a distributor for International Salt Company. During this same period the sale and use of imported salt from the Bahamas, the West Indies and South America was gaining momentum along the eastern seaboard. As a result of these factors Cayuga and Highway attempted to broaden their business activities in Vermont because that state was apparently not vulnerable to imported salt and there was no known motor transportation of salt there. In connection with the above Ettinger and Wilkinson purchased for $ 45,000 approximately 600 acres of land in Castleton, Vt., in the spring of 1961 for the purpose of using such land as a salt warehouse and distribution center. The property contained 10 silos suitable for salt storage and had railroad access. The $ 45,000 used to purchase the property was borrowed by Ettinger and Wilkinson from the Tompkins County Trust Company. On June 15, 1961, a New York corporation called Vermont Slate Distributors, Inc. (hereinafter referred to as "VSD") *378 was organized to act as a real estate holding company for the Castleton property. Ettinger and Wilkinson conveyed the Castleton property to VSD and VSD assumed their indebtedness on the property on February 2, 1962. From the date of incorporation until July 29, 1965, the stock of VSD was owned equally by Ettinger and Wilkinson. Prior to July 29, 1965, the directors of VSD were as follows: Robert L. Wilkinson William B. Wilkinson Louis J. Ettinger, Jr. Bruno A. Mazza After July 29, 1965, the same persons who were the directors of Highway became the directors of VSD.Prior to July 29, 1965, the officers of VSD were as follows: $ M02,00,00$ D$ QPresident$ B- Robert L. Wilkinson$ QVice President$ B- Louis J. Ettinger, Jr.$ QSecretary-Treasurer$ B- John Sloat$ X After July 29, 1965, the same persons who were officers of Highway became officers of VSD. On December 13, 1961, Cayuga advanced VSD the sum of $ 7,500 without interest and took back a demand promissory note therefor. The previous owner of the Castleton property, Central Commercial Corporation, had used the property to quarry slate for the production of roofing granules and as a by-product it had accumulated a residue of powdered *379 rock known as "waste fines" to the extent of between four and six million tons deposited over a 40-acre portion of the property. Central Commercial Corporation had been investigating the commercial use of these "waste fines" and as part of the transfer of the property passed on the technical reports relating to the use of the "waste fines." The technical reports were on tests made by Penn State University to determine whether there was a feasible process for pelletizing (upsizing) the "waste fines" for use as a lightweight building material. On April 24, 1962, Vermont Light Aggregate Corporation (hereinafter referred to as "VLA") was incorporated under the laws of the State of Vermont to find a commercial use for the "waste fines." From its incorporation until July 29, 1965, the stock of VLA was equally owned by Ettinger and Wilkinson. Prior to July 29, 1965, the directors of VLA were as follows: Louis J. Ettinger, Jr. Bruno Mazza John F. Sloat After July 29, 1965, the same persons who were directors of Highway became directors of VLA. Prior to July 29, 1965, the officers of VLA were as follows: $ M02,00,00$ D$ QLouis J. Ettinger, Jr.$ B- President$ QRyan Oakes (Ettinger's son-in-law)$ *380 B- Vice President$ QJohn F. Sloat$ B- Secretary-Treasurer$ X After July 29, 1965, the same persons who were officers of Highway became officers of VLA. On September 7, 1962, Highway and Cayuga held special board of directors meetings for the purpose of empowering the officers of both corporations to act for their respective corporations by any means necessary to support the establishment of the business of VLA. To "strengthen the management of" Cayuga John W. Ettinger was made a vice president with Louis J. Ettinger, Jr., becoming secretary and John F. Sloat becoming treasurer. Wilkinson remained as president. Prior to this change Ettinger was vice president and Sloat secretary-treasurer. On September 18, 1962, VSD conveyed title to the "waste fines" deposits to Highway and Cayuga in a ratio commensurate with the financial contribution each company expected to make toward the development of the fines (70 percent and 30 percent, respectively). Ettinger executed the agreement conveying title to these "waste fines" on behalf of both VSD and Highway and John F. Sloat executed the agreement on behalf of Cayuga. On December 28, 1962, Cayuga advanced VLA $ 80,000 without interest and *381 took back a demand promissory note therefor. This advance was recorded in Cayuga's journal under "Investment-A/C - Vermont Light Aggregate Corp.," but referred to on its December 31, 1965, summary submitted to the PSC as a note receivable. Cayuga borrowed $ 80,000 from the Tompkins County Trust Bank in late November 1962 and borrowed an additional $ 30,000 from the same bank on February 7, 1963. Yankee Salt Corporation (hereinafter referred to as "YS") was organized in Vermont on March 19, 1963, for the purpose of becoming the sole distributor for Rock Salt in the New England area. From the date of its incorporation until July 29, 1965, the stock of YS was owned equally by Ettinger and Wilkinson. Prior to July 29, 1965, the directors of YS were as follows: Robert L. Wilkinson William B. Wilkinson Louis J. Ettinger, Jr. Bruno A. Mazza After July 29, 1965, the same persons who were directors of Highway became directors of YS. Prior to July 29, 1965, the officers of YS were as follows: $ M02,00,00$ D$ QRyan P. Oakes (Ettinger's son-in-law)$ B- President$ QLouis J. Ettinger, Jr.$ B- Vice President$ QJohn F. Sloat$ B- Secretary-Treasurer$ QLouis J. Ettinger, Jr.$ B- Clerk$ X$ =P After *382 July 29, 1965, the same persons who were officers of Highway became officers of YS. On June 14, 1963, Cayuga sold four International tractors and semi-trailers to YS and VLA for their joint use in trucking rock salt and light aggregate as private carriers. Cayuga took a $ 30,000 joint demand note without interest for these trucks and set up separate accounts for $ 15,000 due from each company. This advance was first entered in Cayuga's journal in January 1966 when it was entered under "Investment A/C - Vermont Light Aggregate Corporation." From the date of VLA's incorporation through the years involved herein, Cayuga advanced funds without interest to VLA to supplement VLA's working capital during the test runs and initial production of light aggregate. Cayuga recorded these advances on its books as accounts receivable owing by VLA. The December 31, 1965, summary submitted to the PSC shows accounts receivable due from "Affiliated Co. V.L.A." in the amount of $ 91,235.89. These advances, recorded as accounts receivable, included the payment of $ 46,540.30 to the Moravia Bank on an industrial loan to VLA and $ 27,712 to the Proctor Bank on a capital loan to VLA. Highway also made *383 advances of approximately $ 40,000 to VSD, VLA and YS during the same years petitioner was advancing money to these corporations. At Highway's annual stockholders meeting held on July 19, 1965, John F. Sloat, Highway's controller and Cayuga's treasurer, outlined the plans for Highway's acquisition of the stock of VSD, VLA and YS. Mr. Sloat observed that the stock of the three corporations was owned by individuals who were also stockholders of Highway and that the individual shareholders (Ettinger and Wilkinson) had agreed to donate their shares of stock to Highway. The primary reason for the donation was that with full control it was hoped that Highway could turn these corporations into profitable organizations. On July 26, 1965, Mr. Sloat issued a memorandum to "Management, Sales and Accounting Personnel, Affiliated Corporations." The memorandum observed that Highway now owned VSD, VLA and YS and that Mr. Sloat had been "designated to take on the duties of overall Controller of all operations of all corporations, Highway Materials, Cayuga Service, Vermont Light Aggregate and Yankee Salt." It was Mr. Sloat's job, as Ettinger's assistant, to handle the major financing, financial *384 planning and spending. On July 29, 1965, Ettinger and Wilkinson donated their stock in YS, VSD and VLA to Highway. All of the advances to VLA, VSD, and YS supported by promissory notes are referred to on petitioner's December 31, 1965, summary sheet as "Notes. Rec. Affiliated Co." Prior to the date Ettinger and Wilkinson donated their stock in VSD, VLA and YS, each corporation had sustained substantial losses. During each of the three preceding years before the stock transfer Highway's and Cayuga's taxable incomes were as follows: HighwayTaxable YearTaxable Income6-30-63$ 32,675.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,297.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,545.94Cayuga1962$ 27,026.58196334,429.81196460,558.90During the taxable years ending June 30, 1966, and June 30, 1967, Highway filed consolidated returns with VSD, VLA and YS. These returns disclose the following information regarding the taxable income of Highway and the three subsidiaries: YearMembers of Consolidated GroupTaxableIncome6-30-66Highway$ 74,744Yankee Salt(6,423)VLA(133,228)VSD(858)consolidated return(65,974)6-30-67Highway$ 103,435Yankee Salt53VLA(110,414)VSD(887)consolidated return(16,840)1966 NOL carryover(65,974)Loss$ (82,814)Because of various adjustments made *385 by the Internal Revenue Service to Highway's consolidated returns for the above taxable years, the consolidated loss for the taxable year ending June 30, 1966, was increased to $ 79,261.10 and for the taxable year ending June 30, 1967, reduced to $ 76,001.29. In January 1966 YS made a $ 3,000 payment to Cayuga to be applied against its $ 15,000 loan. Cayuga incorrectly posted this payment by crediting $ 1,500 to YS and $ 1,500 to VLA. This error was corrected in February 1967 by a journal entry on Cayuga's books.Another journal entry on Cayuga's books in February 1967 transferred $ 80,703.30 to "Investment A/C - Vermont Light Aggregate" from accounts receivable. This $ 80,703.30 was comprised of $ 46,540.30 paid by Cayuga to the Moravia Bank on an industrial loan, $ 27,712 paid by Cayuga to Proctor Bank on a Vermont Industrial Building Authority capital loan, and $ 6,451 labeled as "consolidations of receivables." Three previous advances to VLA supported by notes were also carried in Cayuga's journal as "Investment A/C - Vermont Light Aggregate" and yet on the December 31, 1965, summary sheet were recorded as "Rec. Notes - Aff. Co. - V.L.A." Cayuga earned the following revenue from *386 carrying freight on behalf of VLA and YS during the years 1966, 1967 and 1968: ShipperFreight Revenue Year196619671968Vermont Light Aggregate$ 30,007.94$ 64,230.83$ 48,933.47Yankee Salt Corp.1,274.77-0--0-Total Revenue$ 31,282.71$ 64,230.83$ 48,933.47The Internal Revenue Service audited Highway's consolidated corporate tax returns for the taxable years ending June 30, 1966, and June 30, 1967. For both years respondent allowed Highway a correlative interest deduction. The adjustment was explained in the 30-day letter as follows: In the related audit of Cayuga Service, Inc., it was held that the related company should report interest income in this amount [$ 3,612 and $ 13,077.53] under section 482 of the 1954 Internal Revenue Code. This adjustment is to allow the interest expense to this taxpayer. The taxpayer is not in agreement with this adjustment. As previously noted, VSD, VLA and YS were Highway's subsidiaries for the years ending June 30, 1966, through June 30, 1968, and consolidated Federal income tax returns were filed by Highway and these subsidiaries for each of these years. These returns disclose that VLA and YS had borrowed money from unrelated parties and that both *387 corporations paid and deducted interest on these loans. During the years 1966 and 1967, 75 percent of Cayuga's business was attributable to Highway and YS. Prior to these years a substantial portion of Cayuga's business was from Highway and Rock Salt.OPINION Section 482 provides as follows: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.The purpose of the provision is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining, according to the standard of an uncontrolled taxpayer, the true taxable income of the controlled taxpayer. Section 1.482-1(b) (1), Income Tax Regs. For a discussion *388 of the legislative history of the provision see B. Forman Company v. Commissioner, 453 F.2d 1144, 1150-1151 (C.A. 2, 1972), certiorari denied 407 U.S. 934 (1972), reversing in part 54 T.C. 912 (1970); Kahler Corp., 58 T.C. 496, 508-509 (1972), reversed 486 F.2d 1 (C.A. 8, 1973).Petitioner first contends that it does not come within the "owned or controlled directly or indirectly by the same interests" provisions of section 483. The record, however, indicates that Cayuga was owned equally by Ettinger and Wilkinson at the time it made the advances to VSD, VLA and YS. These three corporations were also owned equally by Ettinger and Wilkinson. The record also indicates that the same interests (Ettinger and Wilkinson) controlled the four corporations at the time of the advances. However, the years in issue, 1966 and 1967, are not the years when the advances were made. During these two years it is our judgment that the four corporations were controlled directly and/or indirectly by Ettinger. 2*389 While petitioner agrees that Ettinger controlled VSD, VLA and YS during 1966 and 1967, petitioner argues that Ettinger did not control Cayuga during this period and that, therefore, section 482 cannot be applied. The record, however, indicates that petitioner cannot prevail on this point. With respect to what constitutes control, the following is noted in B. Forman Company v. Commissioner, supra at 1152-1153: 3No definition of"control" is contained in section 482. It has been opined that this omission was intentional in order to allow for flexibility *390 of administration. Plum and Kapp, Reallocation of Income and Deductions Under Section 482, 41 Taxes 808, 811 (1963). Guidelines for determining control are contained in Treas. Reg. 1.482-1(a) (3): "The term "controlled" includes any kind of control, direct or indirect, whether legally *391 enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted." To the same effect see Treas. Reg. 39145-1(a) (3) and annual Treasury regulations thereafter. As to "same interests," there is no statutory definition and no Treasury regulations guidelines. In order to find control, no percentage requirements are specified nor are any precise requirements necessary. The trend in the recent case law is to apply the realistic approach. * * * It is clear that it is the reality of control which is determinative. We find that Ettinger's ownership (direct and indirect) in Cayuga did in actuality constitute control. Ettinger controlled Highway and his employees at Highway held all but one of the office positions at Cayuga during the years 1966 and 1967. The "Ettinger people" also controlled Cayuga's board of directors. Petitioner contends that the third director, A. Leonard Mott, was an independent director not an "Ettinger man", and that, therefore, Ettinger did not control the board. However, the record indicates *392 to the contrary. We find that A. Leonard Mott was an "Ettinger man." He had been a director of Highway since 1957 and remained a director throughout the years in question. In addition it was Ettinger who nominated Mott to serve on the board of directors of Cayuga. The only evidence that Mott was not an "Ettinger man" was the self-serving testimony of Wilkinson and Ettinger. 4 This self-serving testimony is insufficient to carry petitioner's burden of proof. We also note the coordinated actions of all the parties involved. Petitioner next contends that even if we find that the control requirement of section 482 was met, petitioner must still prevail since the advances made to VSD, VLA and YS were investments, not loans. In making this argument it is urged that we disregard the form of many of the transactions. In answer to petitioner's suggestion we reiterate the following: While it is true that we normally look to the substance *393 of a transaction rather than its form, if a taxpayer asserts that the substance is different than the form he used, he must furnish strong proof that the substance was other than the form indicates. Ullman v. Commissioner, 264 F.2d 305 (C.A. 2, 1959); J. Leonard Schmitz, 51 T.C. 306 (1968), affirmed sub nom. Throndson v. Commissioner, 457 F.2d 1022 (C.A. 9, 1972). * * * [Richard H. Pritchett and Virginia B. Pritchett, 63 T.C. [*] (Nov. 13, 1974).] In this instance petitioner herein has failed to meet its burden of persuading us that the advances were in fact investments and not loans. While both Ettinger and Wilkinson testified that they considered the advances to be investments and some of the journal entries referred to the advances as investments, we find that the overwhelming weight of the evidence clearly indicates to the contrary. In particular, the evidence before us indicates that petitioner received promissory notes executed by Ettinger totaling $ 147,500. In addition the December 31, 1965, summary sheet filed by Wilkinson with the PSC refers to the advances as notes receivable and accounts receivable from affiliated companies.We also note that YS repaid $ 3,000 of the *394 funds it received and Wilkinson testified that some portion of the other advances were also repaid. Finally, we note that at the time of the advances no additional stock was issued and the capital accounts in the three corporations apparently stayed the same. In short, petitioner has failed to present any convincing evidence that the advances were not loans. We also find that these loans were interest-free and not made at arm's length. An arm's-length interest rate is defined in section 1.482-2(a) (2), Income Tax Regs., as the rate which would have been charged in independent transactions between unrelated parties under similar circumstances. 5*395 These regulations have been approved and applied to interest-free loans. B. Forman Company v. Commissioner, supra.In B. Forman Company the court noted the following: The instant loans without interest are obviously not at arm's length, since no unrelated parties would loan such large sums without interest. The allocation of the interest income to taxpayers was necessary in order to properly reflect their taxable incomes. The above clearly applies to this case. See also Liberty Loan Corporation v. United States, 498 F.2d 225 (C.A. 8, 1974). During the years in issue interest-free loans in substantial amounts were outstanding from Cayuga to VSD, VLA and YS. These loans were used by VSD and YS for the purchase of construction or capital items and by VLA for both working capital and capital items. During this same period Cayuga borrowed at least $ 110,000 from commercial lending institutions and paid interest thereon. It is evident that these borrowings would not have been necessary but for the fact that Cayuga was loaning funds to VSD, VLA and YS. There is thus a clear inference that had VSD, VLA and YS borrowed their needed funds from an unrelated source, or from Cayuga in an arm's-length transaction, they would have been required to pay a fair interest rate.Conversely, although Cayuga transferred money and equipment, it received no compensation for its loans thereby decreasing the gross income it would have earned had the loans been at arm's length. *396 In addition, Cayuga's taxable income was further reduced because it borrowed money from commercial institutions to make some of the loans and consequently paid and deducted interest. It is also noted that VLA and YS paid interest on funds borrowed from third parties. We thus find that the facts clearly indicate that the loans were not made in arm's-length transactions. Petitioner argues that since Cayuga received freight revenues from VLA and YS, to now allocate interest income would be to disregard business realities. We find no merit to the contention. Petitioner next contends that since VLA, VSD and YS had no income for the years in issue, there is no income to allocate and, therefore, the Commissioner cannot allocate income to Cayuga. Respondent, on the other hand, contends that he has authority to allocate interest income to petitioner under section 1.482-2(a), 6*397 Income Tax Regs., and it is immaterial whether VLA, VSD and YS derived income from the advances. This Court has in the past followed the rule that an allocation of income under section 482 is not required where it is not intended by the parties that a charge be made and no income is realized from the particular transaction. See Huber Homes, Inc., 55 T.C. 598 (1971); Kerry Investment Co., 58 T.C. 479 (1972), reversed [*] F.2d [*] (C.A. 9, 1974), on this issue; Kahler Corp., supra; Fitzgerald Motor Co., 60 T.C. 957 (1973) (on appeal C.A. 5). Respondent urges us to reconsider our position in these cases. In making this argument respondent relies upon B. Forman Company v. Commissioner, supra.7Without commenting upon the merits of the arguments, we *398 decline to reconsider our position at this time. Although our decisions in both Kahler Corp. and Kerry Investment Co. have been reversed, both of these recent cases were Court reviewed, and this review occurred subsequent to the release of the Second Circuit's opinion in B. Forman Company. We do note that the Circuit Courts' opinions in Kahler Corp. and Kerry Investment Co. both give approval of the Second Circuit's opinion. In addition, Fitzgerald Motor Co., which follows Kerry Investment Co., is still on appeal. 8 While at some point in time we may have to reassess our position, we deem this an inappropriate time since the issue has so recently been considered by the full Court and the basis of this result does not necessitate a reconsideration. In this instance an appeal would lie in the Second Circuit and in Jack E. Golsen, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), we held that we will follow a Court of Appeals decision which is squarely in point where the appeal lies to that Court *399 of Appeals and to that court alone. Since we find B. Forman Company v. Commissioner, supra, squarely in point, we shall follow it. That case held that economic reality demands that arm's-length charges be recognized (i.e., the interest charge is treated as income to one of the controlled corporations with a corresponding adjustment to the other controlled corporations' income) in order that the true taxable income of all of the corporations will be properly reported. 9*400 Viewed as such, the interest-free loans resulted in a shifting of income between Cayuga and the three borrowing corporations. It was, therefore, within the Commissioner's power under section 482 to allocate interest income to Cayuga to reflect its true income. With respect to petitioner's "creation of income" argument, we also note that section 1.482-1(d) (2), Income Tax Regs., requires a "correlative adjustment." Petitioner finally contends that the 1968 regulations (sections 1.482-1(d) and 1.482-2, Income Tax Regs.) cannot be applied retroactively to Cayuga's 1966 and 1967 taxable years. We find no merit to this argument. These regulations were promulgated to further explain section 482 and not to change the law. New or amended regulations may be applied *401 retroactively where they merely explain existing law. Cf. Dixon v. United States, 381 U.S. 68 (1965). See also section 7805(b); Rev. Proc. 66-33, 1966-2 C.B. 1231. We, therefore, find that the Commissioner properly applied section 482 to allocate gross income to petitioner measured by five percent of the loans so as to clearly reflect petitioner's income. Decision will be entered for the respondent. Footnotes1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. 2. Since petitioner has not contended that the same persons who controlled the four corporations at the time of the advances must be the same persons who controlled the four corporations at the time of the years in issue, we do not consider that possible issue. It would also appear that the "owned or controlled" requirement may have to be met not only at the time of the advances but also for the years in allocation is determined. However, it is equally arguable that a transactional approach should be applied. Cf. Arrowsmith v. Commissioner, 344 U.S. 6↩ (1952). In any event, the issue is moot herein as the four corporations were controlled corporations at the time of advances as well as during the years in issue (controlled by Ettinger and Wilkinson at the time of the advances and by Ettinger during the years in issue). 3. The Second Circuit, in reversing our decision with respect to the control issue, held that the control requirement is present where two otherwise unrelated corporations each own 50 percent of the stock of a third corporation if the shareholders act in concert in their dealings with the jointly-owned corporation in the pursuit of a common interest or objective. In rendering our decision in this case we want to emphasize that our result insofar as it relies on Second Circuit opinion in B. Forman Company, supra, does so only because of Jack E. Golsen, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985↩ (C.A. 10, 1971) (see infra in body of opinion). Nothing in the opinion should be construed as a change in our position with respect to the control issue. Having said this, however, we do wish to make it clear that our finding on the control issue in this instance is not in conflict with our prior case law. 4. It was not to the advantage of either Ettinger or Wilkinson to have a shifting of income occur. Such a shifting would increase Cayuga's income and the corresponding deductions would be of no use to Highway (except to increase Highway's consolidated losses.) ↩5. Section 1.482-2(a) (2), Income Tax Regs., provides that the arm's length rate shall be five percent per annum simple interest if no interest is charged, unless the taxpayer can establish a more appropriate rate. Petitioner has not contested the rate charged. 6. Section 1.482-2(a), Income Tax Regs., provides, in part, (a) Loans or advances - (1) In general. Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance. 7. Respondent has not relied upon the circuit courts' opinions in Kerry Investment Co. and Kahler Corp. It is noted that these opinions were not released until after all the briefs in this case had been filed. ↩8. It should be noted, however, that at the time of the release of Fitzgerald Motor Co., Kerry Investment Co. had not yet been reversed. ↩9. See also Kahler Corporation v. Commissioner, 486 F.2d 1 (C.A. 8, 1973), reversing and remanding 58 T.C. 496 (1972), noting particularly the following: The proper standard to be applied in cases such as this is whether or not the loans from the taxpayer to other members of a controlled group would have been made on an interest free basis in arm's length dealings between uncontrolled taxpayers. Whether the Commissioner shows that the borrowed funds actually produced income for the borrowing corporation is of no importance. n7 * * * n7 We find no support in the legislative history of Section 482 for the claim that transactions between controlled corporations must be traced to the production of gross income. The express purpose of that statute is the prevention of tax evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purposes of milking). H.R. Rep. No. 2, 70th Cong. 1st Sess.; S. Rep. No. 960, 70th Cong., 1st Sess. [486 F.2d at 5.] In addition see Kerry Investment Company v. Commissioner, [*] F.2d [*] (C.A. 9, 1974), reversing on this point 58 T.C. 479↩ (1972) at 494-496.