TENNESSEE–ARKANSAS GRAVEL CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 8191.

Circuit Court of Appeals, Sixth Circuit.

June 7, 1940.

F. E. Hagler, of Memphis, Tenn., for petitioner.

Lee A. Jackson, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, and Newton K. Fox, all of Washington, D. C., on the brief), for respondent.

Before HICKS, HAMILTON, and AR-ANT, Circuit Judges.

HICKS, Circuit Judge.

Petition of Tennessee-Arkansas Gravel Company to review a decision of the Board of Tax Appeals affirming the action of the Commissioner of Internal Revenue in assessing against it, on redetermination, deficiencies in income and excess-profits taxes for the year 1934 in the amount of $1,915.-54 and $384.06, respectively.

Petitioner was a Tennessee corporation, organized in 1923 to recover sand and gravel from the Mississippi river bed and sell the same. Its business involved the use of river dredges, barges, boats, etc., and a plant for washing and storing the product, located at Arkansas City. For a number of years the business consisted principally in furnishing ballast to a railroad company and road materials to the highway departments of Arkansas and Louisiana. These programs were virtually completed by 1933 and thereafter petitioner's business was negligible, involving a few small sales of material it had in storage.

About that time the Mississippi State Highway Department planned an extensive road building program and announced that Mississippi corporations would be favored in letting contracts. Accordingly, on April 13, 1933, the Mississippi River Gravel Company (herein called Mississippi) was organized under the laws of Mississippi to bid upon the sand and gravel needs for this program.

C. C. Hawkins, president, and in active charge of the operations of both corporations during 1933 and 1934, owned half of the stock of each. The other half of petitioner's stock was owned by Woodstock Trading Corporation, which in turn was owned by P. Stenning Coate; the other half of Mississippi was owned by Coate.

Mississippi owned no river equipment and early in 1933 petitioner agreed to rent to Mississippi all of its equipment which the latter needed at a rental of $1,000 per month. There was no agreement that this rental should continue longer than for the year 1933. The accrued rentals for 1933 were never paid, because Mississippi, working at Rosedale, an unprofitable location, operated at a loss that year.

During the first five months of 1934 the plant was moved down the river to Vicksburg. Hawkins testified that because of the failure to make money in 1933 and because of the heavy expenses of this move, an oral agreement was made in April of 1934, that no charge would be made by petitioner for use of its equipment in 1934. He testified that this agreement was unconditional, that there was no understanding that rent should be charged later should the business prove profitable for that year, the petitioner taking the position that it were better to keep the equipment in operation, even though it received no return therefor, than for it to be idle and tied up on the river bank.

Five wooden barges, averaging ten to twelve years old, were lost on the first trip down the river in 1933 and petitioner bought six new steel barges, three from the Nashville Bridge & Iron Company under a lease-purchase agreement calling for payments of $855 per month, with the understanding that if, after six months, petitioner saw fit to turn them back, the monthly payments would go for rent. The payments were actually made, not by petitioner, but by Mississippi, a total of $4,275 for the year 1934.

The total gravel sales made by Mississippi in 1934 amounted to $51,427.70.

Petitioner reported no income for 1934; but did report a capital gain of $20,912.50 for that year, resulting from the sale on December 31, 1934, to Mississippi of its entire movable equipment, including seven

steel barges, derrick boats, houseboat, tug boat, etc., for a total consideration of $75,-425.10.

■ The Commissioner assessed an income of $12,000 against the petitioner for the year 1934 and the Board sustained this assessment upon the ground that he was acting under the authority of Section 45, Revenue Act of 1934, 26 U.S.C.A.Int. Rev.Code § 45, which is as follows:

*"Allocation of income and deductions*

"In any case of two or more * * * businesses * * * owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to *distribute, apportion, or allocate gross income* * * * between or among such * * * businesses, if he determines that such * * * is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such * * * businesses." (Italics ours.)

We think this was error. It is fair to say that the Commissioner may have thought that he was acting "in accordance with Sec. 45 of the Revenue Act of 1934" as stated in his explanation of the assessment. It is true enough that petitioner and Mississippi were owned and controlled by the same interests and would, in a proper case, be subject to Sec. 45, but, even so, the Commissioner's authority extended no further than to "distribute, apportion, or allocate gross income" between them.

Regardless of what he may have contemplated, the undisputed fact is, that he made no distribution, apportionment or allocation of gross income between petitioner and Mississippi. He made no attempt to allocate any portion of the $51,427.70, representing the gross income of Mississippi in 1934, to petitioner. The record clearly discloses what he did. He simply concluded that petitioner should have charged Mississippi rent upon the equipment for the year 1934, notwithstanding the fact that petitioner neither charged, collected or could have collected rent under its agreement with Mississippi. Having so determined, the Commissioner fixed the rental to be charged at $1,000 per month based upon the rate charged by petitioner for a portion of 1933. Having so fixed the rental, he charged it to petitioner as income in the following language: "Add:...2. Rent of equipment $12,000.00."

Section 45, supra, did not authorize the Commissioner to set up income where none existed. The principal purpose of the section was to clearly reflect income that did exist.

It is suggested that the law will imply that the Commissioner apportioned the $12,000 to petitioner from the gross income of Mississippi, but the law permits no inferences contrary to fact.

■ After the sale to Mississippi on December 31, 1934, petitioner had left only its trestle, gravel bins and washing plant at Arkansas City and took a deduction for depreciation thereon of $3,246.42 for 1934. The Commissioner disallowed $2,512.02 of the deduction and was sustained by the Board.

There was no substantial evidence to support the Board's conclusion. We think the evidence was unquestionably against it.

The claimed depreciation was 10% of the cost. The plant was constructed almost entirely of pine upon concrete footings. On the trestle, one thousand feet long, were steel rails with a salvage value of less than $100. Hawkins testified that the woodwork was constantly saturated with water during use and that its useful life on December 31, 1934, without repairs, was not more than six months; that the gravel bins, trestle and washing plant were practically worthless and that the wood was practically all rotted; that he had been in the sand and gravel business since 1909 and that in his experience the reasonable life of gravel bins, trestles and washing equipment made of wood was five to ten years; that the trestle built of 10x10's was in a very bad state of deterioration and that while it was still in use the incline car broke through it several times. Hawkins was the only witness who testified touching the actual depreciation.

Stanley testified: "The amount of this depreciation was arrived at by using the rates which had been set in a conference with Mr. Dunlap several years before. I met with Mr. Hagler and Mr. Dunlap and the rate of depreciation was set on the equipment at 10%, that is, on everything with the exception of one steel barge which we owned at that time, and the rate on it was set at 5% and depreciation was taken at those rates right on through 1934. Those rates were applied to the assets which were

sold, as well as to the assets which were retained."

He further testified: "I read the deficiency letter in this case and I found in it that the Commissioner did not change the rate of depreciation upon any of the assets which were sold in 1934; but he did change the rate of depreciation of assets which were retained."

The Mr. Dunlap mentioned by Stanley was presumably an Internal Revenue agent and upon the Board's finding that "the reasonable life of gravel bins, trestles and washing equipment made of wood is from five to ten years," a rate of depreciation of at least 10% was required to recover the balance of the cost, $6,536.02, before the assets had reached the end of their "economic term of usefulness." See Art. 23 (1)-6, Treas.Reg. 86.

Aside from the question whether certain portions of the property had a longer useful life than other portions, we think that for the practical purposes of men engaged in the sand and gravel business, the useful life [Art. 23(1)-1] of petitioner's plant was exhausted on December 1, 1934, and that the deduction sought, which was far less than the unrecovered cost plus salvage, was fully justified.

The decision of the Board of Tax Appeals is reversed and the case is remanded to the Board, with directions to reverse the action of respondent in making a deficiency assessment against petitioner of income and excess-profits taxes for 1934.